Jimmie Wayne JEFFERS, Petitioner,

v.

James R. RICKETTS, Director, Arizona Department of Corrections; and Donald Wawrzaszek, Superintendent of the Arizona State Prison, Respondents.

No. CIV 85–0945 TUC ACM.

United States District Court,
D. Arizona,
Tucson Division.

Feb. 4, 1986.

Donald S. Klein, Frank P. Leto, Pima Co. Public Defenders, Tucson, Ariz., John P. Frank, Jose A. Cardenas, Lewis & Roca, Phoenix, Ariz., for petitioner.

Gerald R. Grant, Asst. Atty. Gen., Phoenix, Ariz., for respondents.

## ORDER

MARQUEZ, District Judge.

Petitioner [hereinafter referred to as Jeffers], filed this action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his convictions for assault with a deadly weapon and first degree murder. He also challenges his sentence of death.

## PROCEDURAL HISTORY

Jeffers was convicted of first degree murder and assault with a deadly weapon following a jury trial in Pima County Superior Court on February 9, 1978. After a hearing on April 14, 1978 the Arizona trial judge found two statutory aggravating circumstances and no mitigating factors. In accordance with the Arizona death penalty statute, A.R.S. § 13–454 (currently A.R.S. § 13–703), Jeffers was sentenced to death.

During the pendency of the automatic appeal to the Arizona Supreme Court, the death sentence was vacated and the matter was remanded for re-sentencing under *State v. Watson*, 120 Ariz. 44, 586 P.2d 1253 (1978) [requiring the sentencing Judge to consider all factors submitted in mitigation, not just those enumerated in the statute]. On June 20 and July 10, 1980 hearings were held to establish aggravating and mitigating factors. The sentencing judge found two aggravating circumstances present: that the Defendant created a grave risk of death to another person in the commission of the murder and that the Defendant committed the first degree murder in an especially heinous, cruel and depraved manner, A.R.S. § 13–703(F)(3) & (6). The court found no mitigating factors to exist and again sentenced Jeffers to death.

His appeal to the Arizona Supreme Court was then reinstated.

Prior to the decision on the appeal, Jeffers joined a class of death row inmates challenging the constitutionality of the Arizona death sentencing procedures in federal court, *Knapp v. Cardwell*, 513 F.Supp. 4 (D.Ariz.1980). The decision upholding the constitutionality of the statute was affirmed by the Ninth Circuit, *Knapp v. Cardwell*, 667 F.2d 1253 (9th Cir.1982).

The Arizona Supreme Court affirmed both the convictions and the sentence imposed, *State v. Jeffers*, 135 Ariz. 404, 661 P.2d 1105 (1983). The court, however, reversed the finding that the Defendant had created a grave risk of death to another during the commission of the murder. The court also reversed the holding that the murder was committed in an especially cruel manner. The court agreed that the murder was committed in an especially heinous and depraved manner and that the proffered mitigating factors did not call for leniency.

Jeffers' execution was set for December 7, 1983. In late November, 1983 he filed a petition for post-conviction relief with the Arizona courts. This action was then filed on December 3, 1983 in the Phoenix division of this court, *Jeffers v. Ricketts*, CIV 83–2322 PHX EHC. A stay of execution was imposed by this court on December 4, 1983. Pursuant to this court's Local Rules of Practice, Rule 1(c), on October 21, 1985, this action was transferred to the Tucson division of the court and renumbered under the present case number.

## EXHAUSTION OF STATE COURT REMEDIES

Respondents initially contended that Jeffers had failed to exhaust his state court remedies. Jeffers' post-conviction petition was denied without a hearing and the Arizona Supreme Court refused to grant review. The Respondents no longer contend that Jeffers has failed to exhaust state procedures. Accordingly, this court will determine the merits of the petition.

## FACTS

In early May, 1976, Jeffers, Penelope Cheney [hereinafter Penny] and another person were arrested on state charges of receiving stolen property. Penny was released on a bond posted by Jeffers. Jeffers was unable to post bond for himself and he remained in custody at the Pima County Jail. While he was at the jail, Jeffers received a copy of a police report from his lawyer concerning his case. That report indicated that Penny and another person were providing information to the police about Jeffers and some heroin transactions. In August of 1976, Jeffers mailed that report to some friends outside the jail. Apparently, they photocopied the report and mailed it back to Jeffers. During a normal jail inspection of the mail, the report was discovered and briefly seized. Later it was photocopied by jail officials and then delivered to Jeffers.

Later that month, Jeffers attempted to send a kite (a jailhouse note) to another inmate named Bobby Norgard. The note was folded several times and handed to a jail detention officer for delivery. Rather than delivering the note, the detention officer opened and read it. The note was then seized.

In early October, 1976 Jeffers was able to post bond in his case pending appeal of his conviction. He went to his parents home in California for a few days and then returned to Tucson, Arizona. Shortly thereafter, he met Doris Van der Veer [hereinafter referred to as Van der Veer]. Jeffers and Van der Veer began to be constant companions immediately after meeting one another, including living together. On October 18, 1978 they moved into the Linda Vista Motel on Miracle Mile in Tucson. Jeffers had told Van der Veer of his past relationship with Penny and informed her that he wanted to get back together with Penny despite what she had done. Jeffers had Van der Veer deliver a note to Penny asking for a meeting with Penny. The note suggested that they get back together and also indicated that Jeffers had some heroin that he wanted to

share with Penny. The record indicates that both Jeffers and Penny were heroin addicts.

Two days after the note was delivered, Jeffers informed Van der Veer that Penny had called and was coming over to discuss getting back together. Jeffers asked Van der Veer to wait outside the motel room when Penny arrived. The two women met each other for a few seconds at the door and then Van der Veer went outside by the motel pool. After about one and a half to two hours, it began to rain. Van der Veer then went to her car and listened to the C.B. radio for a while. She then returned to the room and knocked on the door.

Jeffers unlocked the door and allowed Van der Veer to enter. Penny was lying on the bed unconscious and appearing to be cyanotic. Jeffers was aiming a handgun at Van der Veer and instructed her to sit quietly in a chair. Jeffers then injected a liquid into Penny's wrist stating "I have given her enough shit to kill a horse and this bitch won't die." Van der Veer asked whether they were going to help Penny and was told that he [Jeffers] intended to kill her.

Van der Veer, a former licensed practical nurse, noticed foam coming from Penny's mouth, an indication of heroin overdose. She was able to detect a faint pulse and shallow breathing. Jeffers climbed on top of Penny, removed her belt and began to strangle her with it. Van der Veer requested Jeffers to stop since it appeared that Penny would die from the heroin overdose anyway. Jeffers refused to stop stating: "No, I've seen her this way before and she's come out of it." Jeffers later discarded the belt and began to use his hands to strangle Penny. When it appeared that she had died, Jeffers stopped.

Van der Veer again checked for a pulse. She could not find one so she informed Jeffers that Penny was dead. Jeffers then directed Van der Veer to inject heroin into Penny's body in several places. Jeffers took pictures of Van der Veer doing this. Jeffers also instructed Van der Veer to climb on top of Penny's body and place her

hands around Penny's neck. Again, Jeffers took photographs of this indicating to Van der Veer that he now had evidence that she was an accomplice. Following this, Jeffers climbed back on top of Penny and began to strike her in the face with his hands. For each blow he delivered, he would state: "This is for [so and so, naming several names]." Jeffers then pulled Penny's body from the bed and placed it in the motel room shower where it remained for three days. After three days, Jeffers and Van der Veer removed the body from the shower, wrapped it in plastic trash bags and then tied it up in a sleeping bag. Late that night, the body was placed in the trunk of Van der Veer's car. The next day, Jeffers and Van der Veer left Tucson in separate cars heading towards Sedona, Arizona. The day after their arrival in Sedona, the body was buried in a remote area in a shallow grave. They then returned to Tucson. Additional facts are set forth where necessary throughout this opinion.

Jeffers has asserted seventeen separate attacks on his convictions and sentence. Jeffers has also requested an evidentiary hearing on several of these claims. The court has examined the state court record submitted to it. For reasons set forth more particularly where appropriate in this opinion, there is no need to hold an evidentiary hearing in this matter. The motion for an evidentiary hearing is denied.

As stated above, this court has examined the state court record submitted to it. Since neither party adequately and accurately identified the relevant portions of the state court record, this court was required to examine the entire record in order to comply with the mandates of *Richmond v. Ricketts*, 774 F.2d 957 (9th Cir. 1985). The state court record considered in this case is set forth in the appendix. The more relevant portions of the record are identified with particularity where appropriate. The issues raised in this action will be addressed in the order they appear in the Amended Petition.

## CHALLENGES TO THE CONVICTIONS

*I.* Jeffers' first claim for relief is that it was a denial of his constitutional rights to refuse to grant immunity to the defense witness Louis Rosso. Several of the prosecution witnesses were given immunity in exchange for their testimony. Jeffers requested the prosecutor to grant use immunity to this witness during the trial, [Transcript of February 2, 1978, pages 110 to 112]. The prosecutor refused to grant immunity because the witness had been disclosed late by the defense and under Arizona law only the prosecutor, in his discretion, may grant immunity. Jeffers then requested the trial judge to grant immunity, but the court refused to do so, [Transcript of February 2, 1978, pages 139 to 147].

The trial court, however, agreed to allow the defense investigator to testify as to the out of court statements made by the witness to the investigator. *Id.* The proffered testimony indicated that the witness Rosso had sold a gram of heroin to Jeffers a couple of days before the murder. This would have impeached testimony by Van der Veer that Jeffers had purchased an ounce of heroin before the killing. It would also have supported the defense claim that Jeffers was running low of heroin on the day of the killing and was gone from the motel attempting to purchase some when Penny died. Jeffers asserted an alibi defense that he was not present at the motel when Penny died and therefore did not know how she died. He could not identify the seller of the heroin that he was attempting to make the purchase from on that day, but it was alleged to have been someone other than Mr. Rosso.

Jeffers requests an evidentiary hearing on this issue. As discussed below, the state court record disposes of this issue. No hearing is therefore necessary.

Jeffers contends that there is a constitutional right to have a grant of use immunity to key defense witnesses, *Virgin Islands v. Smith,* 615 F.2d 964 (3d Cir.1980). In *Smith,* the Third Circuit held that where there is prosecutorial misconduct or where the defense witness is crucial to the defense case, the Defendant has a constitutional right to use immunity for that witness' testimony. The court could either order the prosecutor to grant that immunity (or face a directed verdict of acquittal for refusing to do so) or the court could grant the immunity on its own.

This court is not certain that there exists a constitutional right to compel a grant of use immunity for defense witnesses absent a showing of prosecutorial abuse. Several other Circuits have considered the question of whether the Constitution requires a grant of immunity. Most of these Circuits have rejected this claim, *United States v. Turkish,* 623 F.2d 769 (2d Cir.1980) [no due process right exists based on the facts of the case]; *United States v. Herbst,* 641 F.2d 1161 (5th Cir.1981) [no sixth amendment right to use immunity exists]; *Grochulski v. Henderson,* 637 F.2d 50 (2d Cir. 1980) [held that *Virgin Islands v. Smith, supra,* should be limited to its facts, no general right to immunity absent such a showing].

The Ninth Circuit has considered this question and has held that such a due process right might exist upon a sufficient showing. In *United States v. Lord,* 711 F.2d 887 (9th Cir.1983) the court remanded the case for an evidentiary hearing since the Defendant in that action had established a *prima facie* showing of prosecutorial misconduct. The defense theory in *Lord* was entrapment. The defense witness for whom immunity was sought would have clarified whether the Defendant or the informant had initiated the drug transactions as well as providing corroboration of threats made by the informant against the Defendant. Prior to trial, the prosecutor told the witness that he might be prosecuted if he testified. The prosecutor indicated to the witness that if the witness asserted his Fifth amendment rights on the stand, no prosecution would result. The prosecutor also provided the alternative that the witness could testify without fear of prosecution if he submitted to a pre-trial interview and agreed to tell the truth.

■ There is no indication anywhere in the record of prosecutorial misconduct with regard to this witness. The only allegation of misconduct is that the state granted immunity to several of its witnesses. The record indicates that the prosecutor refused to grant immunity because the witness was not timely disclosed by the defense under state court rules. In fact, there was no disclosure of the witness until well into the trial. Jeffers has made no *prima facie* showing of misconduct sufficient to warrant a hearing in this court. The only misconduct alleged falls far below that established in *United States v. Lord, supra,* or *Virgin Islands v. Smith, supra,* [United States Attorney refused to agree to immunity even after juvenile authorities agreed not to prosecute the juvenile witness for any conduct disclosed in his testimony, United States attorney had no jurisdiction at that time over the juvenile]. The state prosecutor's refusal to grant immunity to this witness was not misconduct.

■ Jeffers also asserts that Mr. Rosso's testimony was so crucial that it satisfied the *Virgin Islands v. Smith* standard. It appears that this argument was withdrawn by the defense counsel during the trial, [*see,* transcript of February 6, 1978, page 228, lines 7–18], but even in the event that there was no withdrawal of the claim, there is no merit. This court will assume for the sake of argument that the *Virgin Island v. Smith* standard applies here. Jeffers, however, does not meet that test and is not entitled to relief. The Third Circuit held that due process may require a grant of use immunity in certain circumstances. The court established five elements that must be shown by the Defendant before that requirement applies: (1) the immunity must have been properly sought in the trial court; (2) the witness must be available to testify; (3) the proffered testimony must be clearly exculpatory; (4) the testimony must be essential; and (5) there must not be any strong governmental interests which countervail against a grant of immunity.

The state court record establishes that Jeffers has failed to meet several of these requirements. There is no doubt that Mr. Rosso was available to testify since he took the stand and asserted his 5th amendment rights, [Transcript of February 6, 1978, pages 108 and 109]. There also does not appear to be any strong governmental interests at stake here since the state had already immunized witnesses against heroin transactions, marijuana transactions, burglary and possibly accessory to murder. The witness would only have testified as to one heroin transaction.

The record does not show that immunity was properly sought. It was not requested during several pre-trial motions. In fact, the witness was not even disclosed by the defense until mid-trial. The record also fails to show that the evidence is clearly exculpatory. The proffered testimony would have been that Jeffers had purchased a gram of heroin and not an ounce. This would show that he needed to purchase more heroin by the day of the killing. Mr. Rosso's testimony would not establish the alibi since the transaction was to have been with someone else. The testimony concerned a sale occurring a few days before Penny's death. At best, it would only provide some help to corroborate the alibi, *see, State v. Jeffers,* 661 P.2d at 1125–26. Jeffers also contends that the testimony would have provided important impeachment of the key witness Van der Veer. Impeachment is not a sufficient reason for the Constitution to impose a right to have immunity, *see, Virgin Islands v. Smith,* 615 F.2d at 972.

Perhaps the most important failure of Jeffers' argument on this issue is his failure to establish that the testimony was essential. As stated above, the trial judge allowed the defense to use its own investigator to testify as to his conversations with Mr. Rosso. The testimony would therefore have been before the jury from another source. Following Mr. Rosso's assertion of his 5th amendment rights, the defense investigator, William Heuisler, was called to the stand. Defense counsel conducted direct examination of Mr. Heuisler covering

many other areas during the testimony. Following the defense attorney's statement to the court that he had no more questions, the court called counsel to the bench and the following conference was held:

Court: Aren't you going into this other matter with this witness?

[Defense Counsel]: With respect to Mr. Rosso?

Court: Yes.

[Defense Counsel]: No, I decided not to. *Its so narrow its not of any value.* Transcript of February 6, 1978, page 228, lines 7–18. (emphasis added).

■ Jeffers then had the opportunity to present the same evidence to the jury but chose not to do so. Since the evidence was available from another source, the particular testimony was not essential. Due process does not require the court to step in and order immunity for testimony that the defense could present from another source and the defense does not wish to use that source. Jeffers has failed to establish that he was entitled to a grant of immunity for this witness. This allegation will not support the grant of a writ of habeas corpus.

*II.* Jeffers' second claim is that seizure of the mail coming into the Pima County jail and the seizure of the "kite" violated his first, fourth and fourteenth amendment rights. In addition to the facts set forth above with regard to this issue, the following are noted: The state court held a pretrial evidentiary hearing on the Defendant's motion to suppress this evidence on November 21 and November 23, 1977. The record from this hearing has been carefully reviewed by the court.

Testimony about the seizure of the mail was provided by Ronald J. Cromwell, the jail official who seized the police report. [Transcript of November 21, 1977, pages 132 to 145]. He testified that the report was seized only long enough to conduct an investigation as to whether it was proper for Jeffers to have the report. The mail had been opened pursuant to normal jail policies. Once it was determined not to be contraband, the report was copied so as to attach it to his seizure report, and the

original was delivered to Jeffers. The record indicates that Jeffers was not even aware that the seizure occurred until the report appeared in the state's disclosure file prior to trial. Mr. Cromwell further explained the reason for the seizure at trial. At that time he testified that the reason for the initial seizure was that he thought that the report was the *original* police report, not just a copy of it. Once he determined that it was only a copy, it was given to Jeffers, [Transcript of January 26, 1978, pages 99 to 106].

Jeffers testified at the suppression hearing with regard to the seizure of the "kite." He stated that it was only a folded piece of paper and not in a sealed envelope. Jeffers personally handed the paper to the guard. He could not state whether he thought the guards read "kites" or not prior to the seizure of this one. The reason for the seizure of the "kite" is evident from its contents. It reads in part:

They are both crazy to do what they did. If you get out and want to make some quick cash, they need to go. My mom will send the money where and to who I say. She wants something to happen, too. Name your price and it will be paid the day after its in the papers.

I want to do it myself, but I'm not sure they'll set bond. If they do, it will take a couple of months. I'm in a hurry. I don't want her to get out of town. An O.D. would be fine. Nice and clean.

Transcript of February 3, 1978, page 58.

■ This court's review of Jeffers' fourth amendment claims is limited to a determination of whether Jeffers received a full and fair hearing on these claims by the state courts, *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). As stated above, an evidentiary hearing was held as to both of the seized materials challenged in Jeffers' motions to suppress. There is no indication in the record of that hearing that cross-examination of witnesses was limited or that Jeffers was limited in presenting evidence on these claims. In fact, the record establishes the contrary, as

Jeffers was permitted to call several other jail inmates as witnesses on these issues. The Arizona Supreme Court reviewed the decision of the trial judge and considered the issues raised by Jeffers here, *State v. Jeffers*, 661 P.2d at 1113–16.

It must be concluded then that the state courts provided Jeffers with a full and fair hearing on his claims. The fourth amendment claims are therefore without merit. The court also notes that the recent case by the United States Supreme Court, *Hudson v. Palmer*, 468 U.S. 537, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) establishes that the state court's conclusions on these issues were correct.

■ Jeffers' assertion of a first amendment claim does not support the granting of relief here. Initially, the court notes that neither party has presented a single case where the first amendment, standing alone, required the exclusion of evidence, validly obtained, from a trial that did not concern criminal charges about the speech itself. As an analogy, to adopt Jeffers' claim here would require exclusion of the statement by a person that "I am going to rob this bank" while he is standing outside the bank, from the trial on charges of bank robbery. The first amendment makes no such requirement. The writings seized here were offered to establish Jeffers' intention and motive for the commission of this crime. There were no charges filed specifically imposing criminal punishment upon Jeffers for making the written statements.

■ In any event, Jeffers is not entitled to relief here because there was no violation of his first amendment rights. A prisoner is not entitled to the same first amendment rights as the non-incarcerated average citizen is entitled to. As the Supreme Court has stated:

> While the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation, the legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence. * * Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escaped [sic] plans or containing other information concerning proposed criminal activity, whether within or without the prison.

*Procunier v. Martinez*, 416 U.S. 396, 412–413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224, 239–40 (1974) (footnotes omitted).

■ The "kite" Jeffers sent to inmate Norgard does not even fall under the protection of the first amendment. Had the note been delivered, Jeffers could validly have been charged with the crime of solicitation of murder under A.R.S. § 13–1002 (formerly A.R.S. §§ 13–144 and 13–631.01). Therefore, even if Jeffers had not been incarcerated, the seizure of the "kite" would not have violated his first amendment rights. The fact of incarceration permits even greater restrictions, *Procunier, supra*.

■ As to the seizure of the incoming mail, the uncontroverted evidence establishes that the police report was seized because it was believed to be the original report. An immediate investigation was conducted. Once it was established to be only a copy of the report, the seizure ended. In light of the permissible restrictions that may be placed on inmate mail, this seizure cannot be said to be unreasonable. Jeffers is not entitled to relief based on this allegation.

*III.* Jeffers' third claim is that it was a violation of his sixth, eighth, and fourteenth amendment rights to admit evidence, over defense objection, of assaults by Jeffers on persons other than the two victims.

The challenged evidence was presented to the jury through testimony of Doris Van der Veer, Sharon Galarza, and Roger Valery. The evidence indicates that these attacks occurred after the murder of Penny.

The record indicates that Jeffers was in the need of finding a new source to obtain

heroin. The record establishes that not only was Jeffers a heroin addict, he was also a dealer. After Penny gave her information to the police, most of the people that Jeffers dealt with were arrested. Even after being out of jail for a month, Jeffers was still trying to establish a new supplier for the drug in quantities sufficient for his dealings as well as his habit. In order to obtain a new source, he contacted a former girl friend named Sharon Galarza. Galarza and her boyfriend, Valery, introduced Jeffers to a woman known as "Dirty Mary." Jeffers was to accompany Dirty Mary to Mexico to purchase the heroin. The transaction did not occur. Rather, Dirty Mary stole Jeffers car, a police scanner, a gun, his money and left him in Mexico.

When Jeffers returned to Tucson from Mexico, he contacted Galarza and invited her over to his hotel room to get her "share" from the transaction. When she arrived, Jeffers locked the door, closed the drapes and placed a large butcher knife to her throat. He accused Galarza of setting him up with Dirty Mary and being a part of the rip-off. Galarza and Van der Veer were able to convince Jeffers that Galarza was not involved in the rip-off. Jeffers forced Galarza to inject into her body a large quantity of heroin. At the time that she injected it, she was not certain whether it was heroin or some sort of poison. She had some non-verbal reassurance from Van der Veer that it would be all right prior to injecting the substance. Jeffers then let Galarza go.

The following day, Valery went to Jeffers' apartment. When he came in the door, Jeffers threw Valery onto the bed, placed the barrel of a gun between his eyes and threatened to kill him for setting him up with Dirty Mary. Valery was able to convince Jeffers that he did not know that Dirty Mary was going to rip him off. Following that, Jeffers released Valery unharmed.

The trial court allowed this evidence to be presented over a timely defense objection. The court gave a limiting instruction with regard to this evidence, however. The jury was told that they could consider this evidence only to show (1) identity of the defendant; (2) to show motive; (3) to show intent; (4) to show that the defendant had the knowledge and means useful and necessary for the commission of the crime; or (5) that it showed a common scheme or plan. The jury was instructed to disregard the evidence for all other purposes. The instruction is found as Exhibit A to the Respondents' Answer filed December 20, 1983.

The Arizona Supreme Court upheld the admission of this evidence holding that it was admissible to show the witnesses' fear of Jeffers in order to explain why the crime was not reported until late January, 1977, three months after it occurred. *State v. Jeffers,* 661 P.2d at 1117–18. Jeffers does not seek an evidentiary hearing on this issue.

Jeffers' challenge here is not that the evidence should not have been admitted. He contends that its admissibility for the reason set forth in the Supreme Court's opinion is not one of the reasons listed in the trial court's limiting instruction and therefore to consider it for that purpose is improper.

 Questions about the admissibility of evidence are matters of state law, *Bashor v. Risley,* 730 F.2d 1228, 1238 (9th Cir.1984); *Perry v. Rushen,* 713 F.2d 1447, 1449 (9th Cir.1983). It will support relief under habeas corpus only if it was of a magnitude as to amount to a denial of fundamental fairness, *Cronnon v. Alabama,* 587 F.2d 246, 250 (5th Cir.1979).

Under the Arizona Rules of Evidence, this evidence was admissible. Other than Jeffers' alibi defense, Jeffers' other defense theory was limited to an attack on the credibility of the witnesses. The murder was not reported until three months later despite Van der Veer being an eyewitness and Jeffers confessing the killing to Galarza shortly after the assault. Galarza did not report the matter to the police until the eve of her own trial for prostitution and selling heroin. As a result of the

evidence she provided, those pending charges were dismissed. Credibility of these witnesses was in issue.

■ Jeffers does not dispute that this evidence was relevant to credibility. The trial court gave a proper limiting instruction to the jury. The fact that the Arizona Supreme Court determined the evidence to be admissible for reasons other than the ones indicated by the trial court does not deprive Jeffers of due process. The admission of this evidence was not so erroneous or prejudicial, in light of the limiting instruction and the decision by the state court that it was admissible under some theory, as to deny Jeffers of a fair trial, *see, Butcher v. Marquez,* 758 F.2d 373, 378 (9th Cir.1985). Jeffers is not entitled to relief on this claim.

■ *IV.* Jeffers' next challenge seeks a new trial because he was forced to appear before the jury in identifiable jail clothing. Jeffers requests an evidentiary hearing on this issue, claiming that facts are in dispute since the Respondents deny that the clothing is "identifiable" and further deny that Jeffers wore them "involuntarily." These are not disputed facts, but disputed conclusions. The record adequately describes the clothing and the circumstances for Jeffers' appearance before the jury in the clothing. No evidentiary hearing is required on this issue.

Jeffers' trial began on January 10, 1978. On the first day that evidence was presented to the jury, January 17, 1978, Jeffers appeared in court wearing clothing issued by the Pima County Jail. A motion for mistrial was immediately made. The clothing was described as a blue shirt, dark-either blue or green-pants, sandals and no socks. The only identifying marks on the clothing are either the words "Jail" or "Pima County Jail." These words appear only on the seat of the pants. Neither attorney was able to inform the court whether the jury had observed the seat of the pants when Jeffers was brought into the courtroom or if Jeffers had stood up in their presence, [Transcript of January 18, 1978, pages 2–9].

The trial court conducted an evidentiary hearing to determine if Jeffers' appearance in those particular clothes was voluntary. Jeffers had previously indicated that he had been experiencing problems with harassment from jail personnel, [Transcript of January 13, 1978, pages 158–59]. Jeffers indicated that he went to sleep at about 7:00 p.m. on January 16, 1978. He awoke at 9:00 p.m. then went back to sleep. At 11:00 p.m. jail personnel woke him for medication. At 12:30 a.m. they woke him to tell him that he would be going to court in the morning. Between 1:15 and 1:20 a.m. he was awakened and informed that he could take a shower at 2:30. At 2:30 a.m. they woke him again to tell him that the shower would be at 3:30. At 3:00 a.m. another prisoner across the hall from Jeffers had a fight with jail guards that woke Jeffers up again. At 3:20 a.m. he was offered his shower. At 4:45 a.m. they woke him up for breakfast. At around 6:00 a.m. he was awaken for medications. Jeffers testified that he refused his street clothing during the waking up for the shower at 3:20 a.m. because he was tired and sick. When he refused his street clothes, he was informed that they would still take them to the courthouse, [Transcript of January 17, 1978, pages 54–72].

The court called jail personnel as its witnesses both to verify Jeffers' allegations and to attempt to have Jeffers treated better at the jail. These witnesses verified that they had in fact disturbed Jeffers sleep that night as often as he had claimed. The detention officer who had offered Jeffers his street clothes testified that he offered them at the same time that he woke Jeffers to notify him of court the next day. He then placed the clothing in his shift supervisor's office for pickup by the court van driver. The clothing was not picked up from that office because of a "breakdown in policy" in that the van drivers were refusing to take anyone's clothing with them, [Transcript of January 17, 1978, pages 176–210].

The trial court concluded that Jeffers had been given the opportunity to wear his

street clothing and had refused the offer. He was therefore appearing in jail clothing by voluntary choice. The Arizona Supreme Court agreed with this conclusion nothing that despite the frequent awakenings, Jeffers, by his own testimony had still received over ten hours of sleep that night. *State v. Jeffers*, 661 P.2d at 1116–17.

■ It is not a *per se* violation of the Constitution for an accused to appear before a jury in jail clothing. It may, however, impermissibly affect the Defendant's presumption of innocence by being a "constant reminder of the accused's condition implicit in such distinctive attire." *Estelle v. Williams*, 425 U.S. 501, 504–05, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126, 131 (1976). Jeffers must show that he was in fact compelled to appear in jail clothing, *Bentley v. Crist*, 469 F.2d 854 (9th Cir.1972). The trial record must demonstrate that a juror would recognize the clothing as having been issued by prison authorities, *United States v. Rogers*, 769 F.2d 1418, 1422 (9th Cir.1985).

■ Jeffers has failed to establish that the clothing was identifiable. Jeffers' own attorney admitted that he did not know whether or not any member of the jury had been able to observe the seat of Jeffers' pants on this day. The only marking that would identify this clothing as being issued by prison authorities is on the seat of the pants. It would then only be visible while Jeffers was standing or walking. The record fails to establish that this occurred.

■ The state courts' conclusions that the appearance was voluntary is supported by the record. It is undisputed that at some point during the early morning hours of January 17, 1978 that Jeffers was offered his street clothing and that he rejected them. The courts rejected the claim that this rejection was prompted by the frequent disturbances of Mr. Jeffers' sleep. There is a credibility dispute with regard to when the offer of clothing occurred. The state courts rejected Jeffers' contention. Jeffers has failed to establish that his appearance was in fact, involuntary.

■ Even if it should be concluded that the appearance was involuntary, the error in this case was harmless beyond a reasonable doubt. Jeffers appeared only one day in jail clothing. At that time he had already been before the jury for a week in street clothing. The record reflects that on the very first day of *voir dire*, Jeffers was escorted out of the courtroom by deputy sheriffs while the jury pool was present, [Transcript of January 10, 1978, pages 30–32]. There was no objection to this procedure. During the course of *voir dire*, each prospective juror was asked if they had seen or heard any publicity about Jeffers' escape or attempted escape from the Pima County Jail. These questions were asked by defense counsel. Jeffers testified on his own behalf at trial. During the course of direct examination Jeffers admitted that he had been in jail since his arrest in early February, 1977 and that he was serving a sentence of over 30 years on other state and federal charges, [Transcript of February 6, 1978, page 84].

There can be no doubt that the jury was aware that Jeffers was incarcerated. His appearance in jail clothing for one day did not impermissibly interfere with Jeffers' presumption of innocence. He is not entitled to relief on this ground.

*V.* Jeffers' next claim is that he was denied a fair trial because a hearsay statement was improperly excluded that was necessary to corroborate his alibi.

The statement excluded as hearsay was a comment made by Mrs. Wheeler, the manager of the Linda Vista Motel, to Myron McRoberts, a guest at the motel. The statement was: "There's a cute blonde in Room 7." The murder occurred in room 7, Jeffers' room. The conversation was alleged to have occurred on the day of the killing and the blonde was alleged to have been the victim, Penny.

The statement supports Jeffers' alibi defense that he was not present at the motel at the time Penny died only as follows: Mr. McRoberts testified that he was staying at the Linda Vista Motel while painting service stations in Tucson. He stated that on

the day of the killing, he and his partner were in back of the motel folding their drop cloths and cleaning their brushes when a blonde woman and another woman walked by, got into a car and drove away. McRoberts said he observed the blonde for a few seconds at that time but could remember her. He identified the blonde as Penny from a photographic lineup. Jeffers' alibi was that he left the motel to purchase some heroin. When he left, Penny and Van der Veer were together in the motel room. When he returned, Penny was already dead. Van der Veer had testified that the only contact she had with Penny was the brief encounter at the motel room door prior to going out by the pool. She testified that Penny was unconscious on the bed when she returned to the room.

The hearsay statement was offered to explain how Mr. McRoberts could identify this blonde, after an encounter of only a few seconds, more than fourteen months later. Mr. McRoberts identified other factors indicating additional reasons why he could remember this day so clearly. He remembered that it was raining that day, that he was folding his drop cloths in the rain (the only time he had ever folded drop cloths at the motel), that he and his partner had gone drinking the night before and that he was hungover on that day. [Transcripts of January 27, 1978, pages 119 to end, and January 31, 1978, pages 8 to 75].

David Birket, the partner of Mr. McRoberts, testified that he recognized Van der Veer from the motel because he remembered the distinctive tattoos she had on her forehead. Initially he identified Van der Veer as the woman with the blonde, but later could not be certain if it was at that time that he saw Van der Veer or some other time around the motel. [Transcript of January 31, 1978, pages 76 to 130]. Neither of these witnesses could state from which room the two women came.

The trial court concluded that the statement from Mrs. Wheeler to Mr. McRoberts was inadmissible hearsay. The Arizona Supreme Court disagreed, holding that the statement was not offered to show that a cute blonde was in room 7 but to show that the conversation between Mrs. Wheeler and Mr. McRoberts took place. The court concluded that the exclusion of the statement however, caused no harm since it was merely cumulative of the other reasons that Mr. McRoberts indicated were necessary to remember this day. *State v. Jeffers,* 661 P.2d at 1123–24.

■ Neither party has cited a single case with regard to this claim. Jeffers does not request an evidentiary hearing on this claim. A state court's determination with regard to its rules of evidence is binding on this court in a habeas corpus action, *Barker v. Morris,* 761 F.2d 1396, 1398 (9th Cir.1985). This court, therefore, accepts the state court's conclusion that the statement involved herein was not hearsay but was cumulative under the Arizona Rules of Evidence.

■ The standard of review in a habeas corpus action where evidence was excluded under state evidentiary rules but the evidence is deemed to be crucial, is a balancing between the state's evidentiary rules and the Petitioner's interests in the evidence, *Perry v. Rushen,* 713 F.2d 1447 (9th Cir.1983). This court must consider all the circumstances in determining the significance of the evidence: "its probative value on the central issue, its reliability, whether it is capable of evaluation by the finder of fact, whether it is the sole evidence on the issue or is merely cumulative and whether it constitutes a major part of the attempted defense." *Id.* 713 F.2d at 1452–53. In considering the weight of the state evidentiary rule, the court must determine "the purpose of the rule, its importance, how well the rule implements this purpose, and how well the purpose applies in the case at hand," *Id.* at 1453.

The statement itself does not establish Jeffers' alibi. It merely shows that Mr. McRoberts' attention was called to the presence of the blonde prior to his seeing her. There is no testimony anywhere in the record indicating that anyone saw Jeffers leave the motel that day.

The evidence was held to be properly excluded because it was cumulative under Rule 403, Arizona Rules of Evidence. The Arizona Supreme Court held that it established only one more reason why this particular day stood out in Mr. McRoberts' mind fifteen months later. Arizona follows the Federal Rules of Evidence. The purpose of Rule 403 is self evident. It is to avoid the waste of time in repeatedly presenting evidence of little value that has already been established. Where the evidence is in dispute, this can also result in the confusion of the jury, and unnecessary consumption of time on collateral issues. 19 Proceedings of the American Law Institute 223 (1942).

In this case, the statement would have added one more reason to the list of reasons why the witness could remember this particular day. Neither of these two witnesses was able to establish that the other woman was Van der Veer. The record indicates that there is a dispute that this particular statement was made. Mr. Birket testified that Mrs. Wheeler had contacted him to ask him to change his testimony. The admission of the statement would have necessitated the return of Mrs. Wheeler to the witness stand. The jury would then be placed in the position of determining whether the statement was made. The statement itself was not directly pertinent to the issues of the case.

The statement itself contains no indicia of trustworthiness or reliability. It is not excludable hearsay only because it was offered to show that the conversation occurred, not the truth of the matter asserted in the statement. Had the Supreme Court concluded that the statement was offered to show that a blonde was around the motel, the statement would be inadmissible hearsay falling under no exception to the rule. The statement was cumulative of the other reasons given by Mr. McRoberts for being able to remember that particular day. The conversation occurred earlier in the day before the observation of the blonde getting into the car. Several of the other reasons that Mr. McRoberts asserted for remembering that day were verified by other evidence, *e.g.*, that it was raining that day, that in fact Mr. McRoberts was staying at the motel on that day.

The purpose of Rule 403 is served by the exclusion of this evidence. Another issue would have been presented to the jury on a matter collateral to the central issues of the trial. An additional witness would have been called to attack the statement. There was already a number of reasons, some of them corroborated by other evidence, of how the witness could remember the particular day and person sufficiently to identify her fifteen months later, while at the same time being unable to identify the other woman in spite of Doris Van der Veer's distinctive facial tattoos.

█ Considering these factors in light of the requirements of *Perry*, it must be concluded that the statement was not reliable evidence. It was not critical to the defense case since other more reliable evidence was presented to the jury on the same question and the matter was only collateral to the defense of alibi. The state evidentiary rule's purpose was served by avoiding additional witnesses on an unrelated issue when sufficient credible evidence was already present. The exclusion of this evidence did not deprive Jeffers of his sixth, eighth and fourteenth amendment rights.

*VI.* Jeffers next challenges the propriety of the admission of evidence concerning a prior assault by Jeffers on the murder victim, Penny.

The evidence concerning this incident was presented by testimony from Edith Meck, the manager of the apartment complex where Jeffers was living at the time and Lillian Ramirez, a nurse at Tucson Medical Center. Mrs. Meck testified that on November 20, 1975, Penny came to her office at the apartments. She was crying and indicated that she had had a fight with her boyfriend. Other than being upset and frightened, Penny appeared to behave normally. After about twenty minutes in the office she calmed down and called a person named Jim. She told him over the phone

that she was going to pack her clothes and unless she came back to the manager's office in a few minutes, she had instructed the manager to call the police. Penny then left the office. A few minutes later she called Mrs. Meck to inform her that everything was going to be fine.

That afternoon, Penny came running past the manager's apartment. She was excited, incoherent, screaming for help and bleeding from her hand. Mrs. Meck tried to stop the bleeding. While she was doing so, Penny had to lean against her in order to remain standing. Penny appeared to want to fall asleep. Mrs. Meck indicated that she had trouble understanding Penny's speech and often made her repeat what she had said. While they were waiting for an ambulance, Penny told Mrs. Meck that Jeffers had "doped her" and threw her out the bedroom window. Later that day, Mrs. Meck walked past Jeffers' apartment and saw the broken bedroom window. [Transcript of January 25, 1978, pages 101 to 149].

Nurse Ramirez testified that Penny was brought to the hospital by ambulance on November 20, 1975. Penny suffered from a cut finger and knee. She was in semi-stuporous consciousness with slurred speech and small non-reactive pupils (all consistent with narcotic use). Penny told the nurse that her boyfriend had drugged her but she refused to identify the drug because she did not want to get her boyfriend in trouble. Penny stated that she jumped from the window because she believed friends were coming over to kill her. The drug narcan was administered to counteract the affects of the narcotic she was given. The nurse indicated that the information was obtained in order to properly diagnose and treat Penny's injuries. She stated, however, that it was not important for medical purposes to find out who administered the narcotic. [Transcript of January 25, 1978, pages 171 to 182].

The trial court permitted the evidence with the same limiting instruction given with the testimony concerning the assaults on Sharon Galarza and Roger Valery, Issue III, *supra*. The Arizona Supreme Court upheld the introduction of this evidence. The statements to Mrs. Meck were held properly admissible under the excited utterance exception to the hearsay rule. Most of the statements made to Nurse Ramirez were properly admitted under the medical diagnosis and treatment exception to the hearsay rule. The statement that she had been drugged by her boyfriend did not come within the exception and was ruled inadmissible. It was held to be harmless error, however, since it was cumulative to the properly admitted statement made to Mrs. Meck. The Supreme Court also held the incident to have been properly admitted since it did not constitute an inadmissible prior bad act under Arizona law. The court also concluded that the admission of the statements did not violate the confrontation clause. *State v. Jeffers*, 661 P.2d 1119–23.

Jeffers contends that the admission of this evidence violated his rights to due process, a fair trial and denied him the right to confront witnesses. Jeffers does not request an evidentiary hearing on this issue.

 The state court's decision with regard to the compliance with state rules of evidence is binding on this court, 28 U.S.C. § 2254(a); *Barker v. Morris*, 761 F.2d 1396, 1398 (9th Cir.1985). Jeffers has cited no cases to support his claim that the evidence deemed properly admitted by the state courts denied him due process and a fair trial. The trial court limited the jury's consideration of this evidence to areas where it was relevant, *e.g.*, to show intent, etc. There is no indication that this evidence was used to indicate anything else. There is no violation of due process or a denial of a fair trial with regard to the evidence held admissible by the state courts.

 Since the Arizona Supreme Court ruled that the statement that the boyfriend drugged Penny made to Nurse Ramirez was held improperly admitted, this court's analysis differs. The admission of such evidence supports a grant of habeas corpus relief only if it rendered the trial so

fundamentally unfair so as to violate due process, *Butcher v. Marquez,* 758 F.2d 373, 378 (9th Cir.1985); *Pennywell v. Rushen,* 705 F.2d 355, 357–58 (9th Cir.1983). The statement merely repeated what had already been testified to by Mrs. Meck. There was inconsistency between the two statements since Mrs. Meck was told that Jeffers threw her from the window and Nurse Ramirez was told that she jumped to escape from the friends. The court properly limited the application of the evidence by giving the limiting instruction requested by the defense. The admission of this statement did not deprive Jeffers of a fundamentally fair trial.

■ This court's analysis of the confrontation clause issue does not depend upon whether the evidence was properly or improperly admitted under state rules of evidence. The issue is whether the evidence is sufficiently trustworthy so that the inability to cross-examine the declarant does not deprive the Defendant of a trial based on reliable evidence, *Barker v. Morris,* 761 F.2d 1396, 1400 (9th Cir.1985). This determination is made on a case by case basis after consideration of all relevant factors and circumstances.

One important factor to consider is whether the evidence is admissible under state rules of evidence that require inherent trustworthiness. The statements made to Mrs. Meck qualified under the excited utterance exception to the hearsay rule which is based on the inherent trustworthiness of statements made under the stress or strain of an exciting event. The other statements to nurse Ramirez fall under the medical treatment and diagnosis exception, which also requires inherent trustworthiness. Another important consideration is whether there is substantial independent evidence of corroboration. The bedroom window in Jeffers' apartment was broken. Penny was unable to stand without assistance, she spoke with slurred speech and had small non-reactive pupils. Her condition improved upon the administration of the drug narcan which counteracts the effects of narcotics. Jeffers also testified about this incident and confirmed its occurrence.

Another consideration present in this case is the necessity of the evidence. Jeffers claimed that he could not have killed Penny because he loved her. This contention was made from the time of opening arguments throughout the cross-examination of several key government witnesses. This evidence rebutted the claim that Jeffers was unable to hurt Penny.

■ Based on the substantial corroboration of the statements by independent evidence including Jeffers' own testimony, the fact that the statement was either admissible under a state rule requiring inherent trustworthiness or was merely cumulative of such evidence, the necessity for the state to present this evidence, the relative nearness of this incident to the murder both in time (although this incident occurred eleven months prior to the murder, Jeffers was incarcerated for six of those months) and in method (both attempts involved the use of narcotics) the evidence must be considered trustworthy. The fact that Jeffers could not cross-examine Penny about these statements does not, in this case, deprive Jeffers of his right to confront witnesses. Jeffers has failed to establish a constitutional violation from this allegation of sufficient magnitude as to warrant habeas corpus relief.

## CHALLENGES TO THE DEATH SENTENCE

*VII.* Jeffers' first challenge attacking his sentence contends that his sixth, eighth and fourteenth amendment rights were violated when the re-sentencing occurred before Judge Birdsall, the same judge who originally sentenced Jeffers because: (1) Judge Birdsall was personally biased against Jeffers; (2) Judge Birdsall had the propensity to impose the death sentence; (3) the mere appearance of impropriety requires a different judge in a capital case. Jeffers requests a hearing to establish these claims.

The arguments offered in support of this allegation are as follows: During the pendency of the appeal and prior to the remand of this case for re-sentencing, Judge Birdsall was elevated to the Arizona Court of Appeals. Even though Judge Birdsall had not presided over a trial for some time, he had still sentenced more people to death than any other Arizona judge. Under Arizona law applicable to this case, the judge who presided over the trial was required to conduct the sentencing, A.R.S. § 13–454 (currently, A.R.S. § 13–703(B) has eliminated this requirement).

The "appearance of impropriety" claim is tied to the claim of bias. The facts asserted in support of these claims are as follows: Shortly after the initial sentence was imposed in this case, Jeffers began a mail order blitz on Judge Birdsall. More than 200 mail order requests were made by Jeffers to be sent to Judge Birdsall. [*Appellant's Opening Brief*, Re-sentencing only, before the Arizona Supreme Court]. The Judge suspected Jeffers as being responsible for the mailings. Judge Birdsall filed a complaint with the postal authorities in order to have the mailings stopped. The record indicates that he received a substantial amount of unsolicited mail each day up to as many as 70 pieces. Following the service of a search warrant by the Postal Service, the mailings stopped. No charges were ever filed with regard to this conduct.

Jeffers filed a motion for a new judge based on bias of Judge Birdsall resulting from the mail blitz prior to the resentencing. That motion was heard before another Judge of the Pima County Superior Court. After an evidentiary hearing, the other judge, Judge Roylston, concluded that the record did not establish bias. He indicated that Judge Birdsall considered the matter to be an "annoying joke" and filed the postal complaint for the sole purpose of having the mailings stopped. [Transcript of March 18, 1980].

The Arizona Supreme Court upheld the decision that Jeffers had failed to establish bias on the part of Judge Birdsall. The court also ruled that any bias that did result was due to Jeffers' voluntary conduct and that he should not be permitted to gain from his own wrongdoing, *State v. Jeffers*, 661 P.2d at 1128–29.

■■■■ Jeffers' claim that the sentence is invalid because re-sentencing by Judge Birdsall presented an impermissible appearance of impropriety is without merit. The cases holding that the appearance of impropriety alone would require reversal of convictions are based on federal statutes 28 U.S.C. §§ 144 and 455. *See*, *United States v. Carmichael*, 726 F.2d 158 (4th Cir.1984); *Limeco, Inc. v. Division of Lime*, 571 F.Supp. 710 (N.D.Miss.1983). This court cannot consider the standard that would apply to this court's own proceedings, but rather, is limited to the application of the requirements of constitutional law. *Perry v. Cuyler*, 584 F.2d 644, 645 (3d Cir.1978). The Constitution is not violated under a charge of judicial bias unless Jeffers can, in fact, show that he was treated unfairly because of the bias, *Walberg v. Israel*, 766 F.2d 1071 (7th Cir.1985); *Margoles v. Johns*, 660 F.2d 291, 296 (7th Cir.1981). Since Jeffers "appearance of impropriety" claim, by its own terms, alleges no factual harm to Jeffers, this court cannot and will not grant relief on this basis. Since this claim cannot result in relief under habeas corpus, this court will not conduct an evidentiary hearing.

Jeffers received a full and fair evidentiary hearing on the claim of actual bias in the state courts. Jeffers was not precluded from calling any witnesses at that hearing. Judge Birdsall did not testify because he was not called as a witness by Jeffers. Since a full and fair hearing was provided by the state courts and this court has reviewed the transcript of that hearing, no further evidentiary hearing is warranted on this claim.

There does not appear to be a clear standard of review in a habeas corpus case for a challenge of judicial bias. There must be a showing that the bias deprived Jeffers of a fair hearing, *see*, *Walberg v. Israel*, *supra*. There must be an indication that the bias of the Judge is personal to the Peti-

tioner and that the bias arises from matters outside the litigation, *Crider v. Keohane,* 484 F.Supp. 13 (W.D.Okla.1979); *Glucksman v. Birns,* 398 F.Supp. 1343 (S.D.N.Y.1975); *see, also, Walker v. Lockhart,* 763 F.2d 942 (8th Cir.1985) and *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966).

■ After examining the cases cited above, it becomes apparent that Judge Birdsall's conduct falls far short of that which was held to be bias. It is uncontroverted in this case that Judge Birdsall considered the mailings to be a joke and further that the sole purpose in filing the postal service complaint was to have the mailings stop. Once the mailings were halted, no further action was taken as to the postal complaint. This claimed improper conduct is far less serious than that in *Walberg, supra,* [Judge threatens defense counsel's future career as an appointed attorney for filing motions rather than just getting the matter over with], and *Lockhart, supra,* [Judge tells police to shoot the Defendant if he tries to escape since the Defendant displayed no compassion during the commission of the crime charged] where relief on this type allegation was granted. It is even less improper than cases where no bias was established, *Cuyler, supra,* [Judge attends funeral of murder victim then presides over the murder trial].

The mailing blitz occurred shortly after the initial sentencing on April 14, 1978. The mailings were halted approximately two months later. The re-sentencing did not occur for a full two years after the mailings were stopped. The record also establishes that Judge Birdsall presided over a series of post-trial motions on July 3rd and July 11th in 1978. This was after the mailings had been received by the Judge and counsel for Jeffers were aware that the Judge had taken steps to stop the mail. No objection was raised to prevent Judge Birdsall from hearing these motions. There is no indication in the record that Judge Birdsall was influenced by Jeffers

conduct in imposing the death sentence in this case. Jeffers has failed to establish a constitutional violation of his rights due to bias of the judge.

The final assertion in support of this claim is that Judge Birdsall had the predisposition to impose the death sentence. Jeffers requests an evidentiary hearing to establish that Judge Birdsall had imposed the death sentence more often than any other judge in Arizona. Even if Jeffers can establish these facts, he is not entitled to prevail on this claim. It would therefore be meaningless to hold an evidentiary hearing on this claim.

■ The argument that a Judge is predisposed to impose the death sentence merely because he has imposed the sentence more often than other judges in the state is meaningless. In every state with the death penalty, one judge will always have been faced with imposing the sentence more often than his colleagues and accordingly, one judge will always impose the sentence at least one time more often than the rest. There are no facts alleged indicating how great the disparity in this case is. It could be one time, it could be ten. Jeffers' bald assertion that there is a disparity provides nothing to this court. This court cannot and will not infer what that disparity is. It is Jeffers' burden to assert at least some facts indicating the size. Nothing is submitted here. In addition, the constitutional requirements are that some harm be established in this case from the bias. The allegation fails to assert that the predisposition has a *personal* application to Jeffers. *see, e.g., Crider v. Keohane,* 484 F.Supp. 13 (W.D.Okl.1979). Jeffers is not entitled to relief on this allegation.

*VIII.* Jeffers contends that he is entitled to a new sentencing because the Arizona Supreme Court reversed one aggravating circumstance, modified the other one and modified the findings as to the existence of mitigating factors. Jeffers contends that the Supreme Court failed to follow its own mandate in *State v. Gillies,* 135 Ariz. 500, 662 P.2d 1007 (1983) by not

ordering a re-sentencing. In *Gillies*, the Arizona Supreme Court initially upheld the imposition of the death sentence despite reversing three of the four aggravating circumstances found by the sentencing court. The trial court had also found some mitigating factors to exist but held that they were not sufficiently substantial so as to call for leniency. On a motion for re-hearing, the Supreme Court reversed itself and remanded the case for re-sentencing. The court concluded that since the trial court found some mitigation to exist, the trial court should make the initial determination whether those factors called for leniency under only one aggravating circumstance.

In this case, the Arizona Supreme Court did not modify the trial court's finding with regard to mitigating factors. The trial judge stated: "The court finds that there are no mitigating circumstances." [Transcript of July 10, 1980, page 216, line 4]. The only mitigating factors submitted to the trial court were that Jeffers was intoxicated by heroin at the time of the murder and had a long history of heroin abuse; that the killing was provoked by the victim as shown by the past "love/hate" relationship between Jeffers and the victim Penny; and finally, that there was insufficient evidence of murder because Jeffers recounted his alibi under the effects of the drug sodium amytal.

The Arizona Supreme Court reviewed the sentencing court's rejection of this evidence and upheld it. The high court characterized the sentencing Judge's decision to reject the evidence as follows: "The record shows the trial court considered all the evidence presented at trial and at the post-trial hearings and found *no mitigating factors sufficiently substantial to call for leniency.*" *State v. Jeffers*, 661 P.2d at 1132 (emphasis added). The Supreme Court held that the proffered mitigating factors were without merit. The Supreme Court rather than modifying the conclusion, merely restated the conclusion of the trial court so as to bring it within the literal confines of the Arizona death penalty stat-

utory provision on mitigation, A.R.S. § 13–703(E).

■ Since no mitigating factors were present, the Supreme Court's refusal to order a re-sentencing probably did not violate the decision in *Gillies, supra.* This court need not reach this conclusion, however. A states' failure to follow its own rules will support habeas corpus relief only if it results in a deprivation of constitutional rights, *Cronnon v. Alabama*, 587 F.2d 246, 250 (5th Cir.1979).

■ Contrary to Jeffers' claims, the mere reversal of one aggravating circumstance does not constitutionally mandate a new sentence, *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) [no re-sentencing necessary where there is no balancing of mitigating factors against aggravating factors]. In each of Jeffers' cases cited in support of this contention, *Hopkinson v. State*, 632 P.2d 79 (Wyoming, 1981); *Williams v. State*, 274 Ark. 9, 621 S.W.2d 686 (1981); *State v. Irwin*, 304 N.C. 93, 282 S.E.2d 439 (1981); and *Williams v. State*, 386 So.2d 538 (Florida, 1980), the death penalty statute involved mandated a weighing of the aggravating factors against the mitigating factors before the death penalty could be imposed. The weighing process in many of these cases was conducted by the jury rather than the court. Neither of these requirements are found in the Arizona procedures. Therefore, these cases are distinguishable from the present one.

Under the Arizona death penalty statute, A.R.S. § 13–703, the death sentence may only be considered after a finding, beyond a reasonable doubt, that the Defendant is guilty of first degree murder. Before the court considers factors in mitigation, it must find, by evidence beyond a reasonable doubt, that one of the six statutory aggravating circumstances has been established. Once this conclusion is reached, the death penalty is imposed unless factors in mitigation are shown to call for leniency. There is no balancing. In addition, these decisions are made by the judge without the

jury and are subjected to an independent review by the Arizona Supreme Court.

Even in a state where balancing occurs, the reversal of one aggravating circumstance where no mitigating circumstances are found does not constitutionally mandate a new sentencing, *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983). In this case, both state courts rejected all the proffered mitigating factors as having no weight. The Constitution does not mandate a re-sentencing in this case because of the reversal of one aggravating circumstance and the modification of the other.

Jeffers has not established a violation of his constitutional rights by this allegation. He is therefore, not entitled to relief on this ground in this action.

*IX.* Jeffers next challenges his sentence claiming that the sentencing judge did not consider and list all the mitigating factors. Jeffers contends that state law requires a listing of all mitigating factors. An evidentiary hearing is requested to establish that the sentencing judge failed to consider: (1) the lack of evidence of murder (based on the statements of Jeffers made under the influence of sodium amytal); (2) plea offers made by the state with a substantially less harsh punishment; and (3) Jeffers' extensive history of drug abuse.[1] An examination of the state court record establishes that there is no relief available to Jeffers from this allegation. The request for an evidentiary hearing on this allegation is denied.

■■■■ Even if Arizona law requires a listing of mitigation factors, the failure to do so will entitle Jeffers to habeas corpus relief only if that failure denied Jeffers of a constitutional right, *Cronnon v. Alabama,* 587 F.2d 246, 250 (5th Cir.1979). There is no constitutional requirement that a list of mitigating factors be made by the finder of facts, *Martin v. Maggio,* 711 F.2d 1273 (5th Cir.1983). The mere failure of the sentencing judge to list all the mitigating factors does not entitle Jeffers to obtain relief in this court.

■■■ The Constitution requires the sentencing fact finder to consider all mitigating circumstances proffered by the Defendant in a death penalty case, *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Arizona follows the mandate of the constitution, *State v. McMurtrey,* 136 Ariz. 93, 664 P.2d 637 (1983) [Judge must consider evidence of mitigation even if it fails to meet statutory standards]; *State v. Richmond,* 136 Ariz. 312, 666 P.2d 57 (1983) [post-sentencing good behavior of prisoner should be considered in re-sentencing]; *State v. Watson,* 129 Ariz. 60, 628 P.2d 943 (1981) [same]. It is within the state court's discretion, however, to determine how much weight should be given the proffered mitigating factors, *Eddings, supra.* The constitutional prohibition is only against the wholesale exclusion of these factors, *Id.*

Judge Birdsall's findings with regard to mitigating factors was a written decision read into the record just prior to the imposition of sentence. The court indicated that it had considered all the evidence presented at trial and in post-trial motions. [Transcript of July 10, 1980, page 216]. The Court then stated: "The Court's search for mitigating circumstances has not been limited to either of these statutes [A.R.S. § 13–454 and A.R.S. § 13–703] but pursuant to *State v. Watson* and *Lockwood v. Ohio* [sic], the Court has considered any possible mitigating circumstances." *Id.*

Judge Birdsall specifically discussed Jeffers' history of drug abuse and gave it no weight in mitigation, *Id.* Jeffers' "lack of evidence" claim was presented to the court in a post-trial evidentiary hearing held June

---

1. In his original petition in this court, the Petitioner also contended that post-sentencing behavior should be considered to determine whether that calls for leniency *now,* i.e. whether the death penalty is appropriate five years (now seven) after the original sentence and three years (now five) after the present sentence was imposed. This claim was not presented in the Amended Petition and is considered by this court to be withdrawn.

20, 1980. Although the court did not specifically discuss this particular evidence the judge indicated that he had considered it in his reference to the post-trial evidentiary hearings. Jeffers' claims that this evidence was not considered at all is factually without merit.

██ It appears that Jeffers' real challenge to the trial court's holdings is not that the factors were not considered, but that they were determined to have no weight. This court has reviewed the evidence presented on these issues. Much of Jeffers' history of drug abuse was presented throughout the trial. Jeffers testified during the trial that during the six months incarceration just prior to the killing, he was unable to obtain drugs. In addition, Jeffers, by his own testimony asserted a clear memory as to what happened on the day Penny died. There is no indication that his heroin use was so substantial as to warrant leniency. The "lack of evidence" claim was presented through expert testimony. Both experts testified, however, that sodium amytal does not preclude the fabrication of a story particularly when the interests at stake in the story are substantial. There was an eyewitness to the killing, Doris Van der Veer. The questions of her credibility were determined by the jury at trial adverse to Jeffers. The state courts' determinations to give these factors no weight is supported by the record and was not an abuse of discretion nor was it erroneous.

Jeffers is correct in his assertion that the sentencing court probably did not even consider the plea offers as mitigating factors. This evidence should be considered under the mandates of *Lockett* and such consideration is required under Arizona law, *State v. Watson*, 129 Ariz. 60, 628 P.2d 943 (1981). The conclusion that the evidence was not considered does not entitle Jeffers to relief, however.

The mandate of the Constitution on this issue requires only that the finder of fact consider the evidence proffered in mitigation before imposing a sentence of death. There does not appear to be a single case

holding that it is the duty of the finder of fact to determine what mitigating factors should be considered in the first place. Rather, all that are proffered must at least be considered.

This court has examined the state court record with regard to the re-sentencing hearings, [Transcripts of June 20, 1980 and July 10, 1980]. There is not one mention of plea offers in those transcripts. The Arizona Supreme Court made no mention of plea offers in its consideration of mitigating factors, *State v. Jeffers*, 661 P.2d at 1131–33. In fact, this court's review of the entire state court record on file in this case found only two indications where matters of plea negotiations were presented. The first indication of plea negotiations occurred during a hearing to settle jury instructions. The entire discussion of the plea negotiations is set forth here:

[Defense Counsel]: Maybe I could interject something that I think has some bearing on this matter.

At some point in time in this case there was some plea discussions. Nothing ever solidified concretely, but I believe there was a good possibility at one time that Mr. Jeffers could plea no contest to second degree and receive eight calendar years, which would have run on top of the time he was running in the federal cases.

Mr. Jeffers at that time refused that plea and his refusal then was consistent with his position now, is I don't want to spend the rest of my life in jail. Either I want to be acquitted or I want to get the gas chamber.

Transcript of February 7, 1978, pages 105–106.

This discussion occurred because defense counsel, at Jeffers request, were attempting to withdraw requested jury instructions on necessarily included lesser offenses. The comment was made to inform the trial judge of Jeffers' reasons for making the request.

The next indication of the plea offers appearing in the state court record is

presented in a petition for post-conviction relief filed after the re-sentencing in 1980 and after the review by the Arizona Supreme Court decided in 1983. [*see.* Transcript of April 2, 1984]. That is the very first time the state court was asked to consider the plea offers as evidence of mitigation.

The discussion of the plea offers during the trial was not such that the trial court would be put on notice of the extent of these negotiations, *see*, discussion of plea offers, *infra*, issue *XI*. It was also not such as would put the judge on notice that they should be considered as mitigation more than two years later at the re-sentencing. Of even more importance in considering this issue are the re-sentencing transcripts of June 20th and July 10, 1980. At no time during that hearing did the sentencing judge preclude the defense from putting on any evidence in mitigation. Jeffers merely failed to present this evidence to the court. Under Arizona law, the Defendant has the burden of proof of evidence in mitigation, A.R.S. § 13–703(C); *State v. Bishop*, 118 Ariz. 263, 576 P.2d 122 (1978); *State v. Ceja*, 115 Ariz. 413, 565 P.2d 1274 (1977).

 Absent a requirement that the sentencing judge must hypothesize as to what possible mitigating factors exist, Jeffers' failure to present the evidence of plea negotiations at the time of re-sentencing will preclude relief here. Since the constitutional mandate is only that the finder of fact must consider proffered mitigation and may not exclude particular types of mitigation evidence, Jeffers is not entitled to relief. This court cannot find and refuses to impose a requirement that the court conduct its own investigation as to evidence within the Defendant's personal knowledge but which the defense refuses or fails to present. Jeffers is not entitle to relief on this claim.

*X.* Jeffers next challenges the statutory aggravating circumstance under which he received his sentence of death. He contends that the circumstance that "The Defendant committed the offense in an espe-cially heinous, cruel or depraved manner," A.R.S. § 13–703(F)(6), is unconstitutionally vague and overbroad and permits the arbitrary application of the death penalty.

Jeffers asserts three allegations in support of this argument and requests an evidentiary hearing to establish these allegations. The allegations in support of this claim are first, that this aggravating circumstance is the most common finding by sentencing judges in death penalty cases, second, it is also the most frequently reversed finding by the Arizona Supreme Court, and third, there are cases where the killing was more heinous and depraved than this one and either the death penalty was not sought or not imposed.

Even if Jeffers can establish these claims, he is not entitled to relief based on this allegation. Accordingly, the request for an evidentiary hearing is denied. As to the third proffered argument in support of this claim, it states a challenge based on proportionality. It will be discussed more fully, *infra*, under issue *XV*.

 To withstand a vagueness and overbreadth challenge, a statute must be reasonably specific. That standard is met if it conveys a sufficiently definite warning as to what the proscribed conduct is when measured by common understanding and practices, *Grayned v. Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Turf Center, Inc. v. United States*, 325 F.2d 793, 795 (9th Cir.1963). Where no first amendment issues are presented, the challenge is limited to the facts of this case, *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706, 713 (1975). Judicial decision may be used to narrow a statute to bring it within the required limitations of the Constitution, *United States v. Bohonus*, 628 F.2d 1167, 1174 (9th Cir.1980).

The authority of the Arizona Supreme Court to interpret limitations into the Arizona death penalty statute has been upheld in a case where Jeffers was a party, *Knapp v. Cardwell*, 667 F.2d 1253 (9th Cir.1982). The Ninth Circuit has already

determined that this challenged aggravating circumstance satisfies the requirement of the Constitution in a case where a car bomb was used to commit the murder, *Adamson v. Ricketts*, 758 F.2d 441 (9th Cir.1985) [Circumstance of "especially cruel" was valid since substantial case law indicated that the unnecessary infliction of pain on the victim would show that the murder where such excessive pain and suffering was inflicted was above the standard murder and therefore warranted the death penalty].

The Arizona Supreme Court has expended substantial energy in limiting the application of this aggravating circumstance, *see, State v. Gretzler*, 135 Ariz. 42, 50–53, 659 P.2d 1, 9–12 (1983) [and cases cited therein]; and *State v. Watson*, 120 Ariz. 441, 447–48, 586 P.2d 1253, 1259–60 (1978) [and cases cited therein]. Specific citations of other cases where the application of this circumstance was limited would be far too lengthy to set forth here. These cases, however, would be part of Jeffers' proffered argument that the circumstance is the most commonly imposed and the most frequently reversed. These facts only enhance the conclusion that the Arizona courts have gone to great lengths to define limits on this statutory provision.

■ A murder that is especially heinous and depraved includes the infliction of gratuitous violence upon the victim and the indication that the defendant committed the crime with relish, *State v. Ceja*, 612 P.2d 491 (1980); *State v. Bishop*, 127 Ariz. 531, 622 P.2d 478 (1980); and *State v. Gretzler, supra*. The evidence in this case indicates that the victim, Penny, had either taken or was injected by Jeffers with such a sufficiently large dose of heroin that she lost consciousness. Even after she lost consciousness, Jeffers injected her with more heroin. When this did not kill her, he attempted to strangle her with a belt and finally accomplished his intended purpose by strangulation with his hands. He then required the eyewitness, at gun point, to perform the same acts on the corpse while he took pictures. He then climbed on top of the corpse and inflicted blows to the face. While striking the corpse, he stated that each blow was for one of the persons that Jeffers believed Penny to have been responsible for their arrest due to narcotic trafficking activities with Jeffers. He then pulled the corpse across the floor to the shower where it remained for three days.

The Arizona law adequately puts Jeffers on notice that a killing under this type of factual circumstances is considered to be more improper than a simple murder, and accordingly, warranting the enhanced sentence of death. The challenge to the statutory aggravating circumstance found in A.R.S. § 13–703(F)(6), under these facts, fails. Jeffers is not entitled to relief based on this claim.

*XI.* Jeffers contends that the imposition of the death penalty after the state has offered plea agreements with a much less harsh sentence, invalidly penalizes Jeffers for exercising his right to trial. At the minimum, Jeffers contends that the plea offers should be considered as mitigating factors.

The question of whether the plea offers should be considered as mitigating factors was previously discussed in issue *IX, supra*. Further discussion is not warranted here. Jeffers is not entitled to habeas corpus relief for his own failure to present this evidence as mitigation.

Jeffers asserts that there were four separate plea offers. Beginning with the earliest offer, they are asserted to have been: (1) plea of guilty to first degree murder with a sentence of life imprisonment; (2) plea of no contest to second degree murder; (3) plea of no contest to second degree murder with a sentence concurrent to any other sentence being served; (4) plea of no contest to second degree murder with a concurrent sentence to all other sentences and a maximum sentence on the second degree plea to 20 calendar years imprisonment.

Respondents dispute that these offers were made. Jeffers requests this court to conduct an evidentiary hearing so that he can establish the plea offers. The state

court record makes no mention of the plea negotiations except as set forth *supra*, in issue *IX*. Regardless of what the plea offers were, Jeffers is not entitled to relief on this claim. No evidentiary hearing is required on this claim.

■■■■ There is no duty on the government to engage in plea negotiations, *United States v. North*, 746 F.2d 627, 632 (9th Cir.1984). Once the plea offer is voluntarily rejected, the existence of the offer does not preclude the state from seeking any lawful sentence, including the sentence of death, *Adamson v. Ricketts*, 758 F.2d 441, 448 (9th Cir.1985). As the Ninth Circuit stated:

> Where the defendant makes a voluntary choice to reject or withdraw from a plea bargain, is convicted of the crimes alleged against him, and receives an otherwise lawful sentence for those crimes, he has no cause to complain that the sentence received is harsher than that originally tendered. In such a case, the defendant has acquired no right to a sentence which he has voluntarily rejected and assumes the risk of a lawfully authorized harsher sentence.

*Id.*

■■■■ There is no claim here that the Jeffers did not voluntarily reject the plea offers. The record indicates that the plea offers were voluntarily rejected. Jeffers knew the risk he was taking since the death penalty was being sought. There is no constitutional preclusion of the death penalty merely because plea offers such as those proffered here were made. There is no merit to this claim.

*XII.* Jeffers challenges the Arizona death penalty procedures under the sixth, eighth and fourteenth amendments to the Constitution because there is no requirement that a jury determine whether aggravating circumstances are present. Jeffers contends that since under Arizona law a jury is required to consider increased sentences due to prior offenses in non-capital cases, one should be required here as well since the interest at stake is greater.

■■■■ Although the jury has a long standing tradition in American jurisprudence, there is no requirement under the United States Constitution that sentencing determinations be made by a jury, even in a capital case, *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) [Sentencing judge could properly reject advisory jury's recommendation of life imprisonment]. *Spaziano* considered this requirement under the eighth amendment. The holding has also been applied to challenges under the sixth amendment, *Adamson v. Ricketts*, 758 F.2d 441, 450 (9th Cir.1985).

■■■■ The holding in *Spaziano* is based, in part, on the conclusion that the death penalty scheme provides adequate procedural safeguards without the requirement of a jury determination. Under the Arizona death penalty statute, A.R.S. § 13–703, before the sentence of death may be considered, the Defendant must be convicted of first degree murder. Following the trial, and in a separate court hearing, the state must establish, beyond a reasonable doubt, that at least one of the seven enumerated aggravating circumstances was present in this case, elevating it from the standard or simple murder to one warranting the punishment of death. The Defendant is then given the opportunity to assert any factors in mitigation that would be sufficiently substantial to call for leniency. The statute also mandates the consideration of other factors, A.R.S. § 13–703(G). Any mitigating factor need only be established by a prepodnerance of the evidence. In the event that the death sentence is imposed, an appeal to the Arizona Supreme Court is automatic. That court then conducts an independent review of the sentencing judge's decisions with regard to aggravating circumstances and mitigating factors. The court also examines the entire record for fundamental error. *See, State v. Blazak*, 114 Ariz. 199, 560 P.2d 54 (1977). These procedures provide adequate protection from the arbitrary, discriminatory, and freakish imposition of the death sentence in Arizona. These procedures

were followed in this case, *see, generally, State v. Jeffers,* 661 P.2d 1129–33. Jeffers' constitutional rights were not violated by the failure of the Arizona death sentencing procedures to provide for jury determination of the existence of aggravating circumstances. *See, also, Adamson v. Ricketts,* 758 F.2d 441, 450 (9th Cir.1985).

*XIII.* Jeffers' next challenge attacks the Arizona sentencing scheme for failing to require jury determinations of mitigating factors. He also claims that the scheme is invalid because it does not require a separate determination that the death penalty is appropriate under the circumstances of the case.

■ Again, *Spaziano* is controlling on the issue of whether a jury must consider mitigating factors. The Arizona sentencing scheme, as discussed immediately above, provides adequate protection from the arbitrary, discriminatory and freakish application of the death penalty. The use of a jury on sentencing questions is not constitutionally mandated.

The same conclusion results from the claim of requiring a separate determination that the death penalty is appropriate under the circumstances. The Arizona procedures meet the constitutional minimum necessary to withstand this challenge. It may be a better procedural scheme to add the additional procedural safeguards of a jury and a separate determination of appropriateness, but they are not mandated by the constitution. Since this courts review is limited to only constitutional questions, Jeffers can obtain no relief on this allegation.

*XIV.* Jeffers next challenges the Arizona scheme's allocation of the burden of proof. Jeffers contends that the eighth and fourteenth amendments are violated because there is no statutory requirement that the government show that aggravating factors outweigh mitigating factors, there is no requirement of a finding beyond a reasonable doubt that the death penalty is appropriate under the circumstances; and finally, the Arizona statute's imposition on the Defendant of the burden of proof of mitigation "sufficiently substan-

tial to call for leniency" is an unconstitutional shifting of the burden of proof.

■ As the Supreme Court has noted, "there is [no] one right way for a State to set up its capital-sentencing scheme." *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 3165, 82 L.Ed.2d 340 (1984); *Adamson v. Ricketts,* 758 F.2d 441, 451–52 (9th Cir.1985). As indicated by the discussion of the procedural scheme set forth, *supra,* under issue *XII,* the death penalty is imposed unless the Defendant can establish mitigating factors calling for leniency only after the state has established, beyond a reasonable doubt, one of the seven statutory aggravating circumstances. There is no balancing of aggravating circumstances against mitigating factors required. As was stated above, the Arizona scheme meets at least the minimum required by the Constitution.

■ As to Jeffers' third claim about the shifting of the burden of proof, more discussion is needed. That argument, however, is without merit. A Defendant is given the opportunity to present factors in support of mitigation only after the state has met the burden of proof on the existence of at least one aggravating circumstance. This all occurs after a conviction on the charge of first degree murder. If the state fails in its burden of proof, the Defendant need show nothing as the death sentence will not be imposed, *see, State v. McMurtrey,* 143 Ariz. 71, 691 P.2d 1099 (1984).

Arizona places the burden of establishing mitigating factors on the Defendant because the "facts which tend to show mitigation are peculiarly within the knowledge of a defendant." *State v. Richmond,* 136 Ariz. 312, 666 P.2d 57, 61 (1983), *quoting, State v. Smith,* 125 Ariz. 412, 416, 610 P.2d 46, 50 (1980). As the Eleventh Circuit has stated: "[m]itigating circumstances are offered during the penalty phase to show the totality of the circumstances. The evidence is offered to show that the circumstances warrant less than the penalty of death. There is no improper shifting of the

burden of persuasion." *Songer v. Wainwright*, 733 F.2d 788, 792 (11th Cir.1984), *quoting, Songer v. Wainwright*, 423 So.2d 355, 356 (Fla., 1982). Jeffers has failed to establish a constitutional violation with this allegation and is therefore not entitled to any relief based upon it.

*XV.* Jeffers' next contention is that a proportionality review is required by the Constitution but none is required by the Arizona statute nor was one performed in this case.

A proportionality review was conducted in this case, *State v. Jeffers*, 661 P.2d at 1133. Jeffers seems to agree that one was provided in his various motions for an evidentiary hearing. He now contends that although one was conducted, it was performed in a manner that was arbitrary and discriminatory in violation of his rights to due process, *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

 No proportionality review is constitutionally required if the death penalty procedures provide adequate protection from arbitrary decisions, *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). This court has already ruled that the Arizona procedural scheme provides adequate protection from arbitrary, discriminatory and freakish application of the death sentence. The Arizona procedure is not unconstitutional because it fails to require a proportionality review.

 Jeffers seeks an evidentiary hearing to establish that the Supreme Court conducted the proportionality review is such a manner as to deny due process. This is a question of law to which no evidentiary hearing is necessary. This court has examined the decisions that the Arizona Supreme Court cited in conducting its proportionality review, *State v. Gretzler*, 659 P.2d 1 (1983); *State v. Ceja*, 126 Ariz. 35, 612 P.2d 491 (1980); *State v. Bishop*, 127 Ariz. 531, 622 P.2d 478 (1980) and has compared the facts of those cases with the facts of this one. The comparison is not so arbitrary as to deny Jeffers of due process, *Hines v. Enomoto*, 658 F.2d 667, 672 (9th

Cir.1981). Jeffers is not entitled to relief on this claim.

*XVI.* Jeffers next contends that the death penalty is arbitrarily imposed in Arizona, the United States and in this case. In support of this contention, Jeffers asserts the following arguments: (1) that other similar cases have resulted in punishment less than the death penalty and (2) prosecutors, juries, and courts have based decisions in death sentences on factors other than the strengths and seriousness of the case. Jeffers requests an evidentiary hearing to establish these claims.

The first proffered basis for this allegation is nothing more than a restatement of the proportionality review claim that has already been rejected in this case. As stated above, there is no merit to this claim.

 Jeffers has not identified one single factor other than the strengths and seriousness of this case that was improperly considered here. Jeffers' mere empty conclusory allegations do not entitle him to an evidentiary hearing. The court has repeatedly stated in this case that the Arizona death sentencing scheme contains a sufficient level of procedural safeguards to prevent arbitrary application of the death sentence. This claim is wholly without merit.

*XVII.* Jeffers' final contention is that the Arizona death penalty is being discriminatorily imposed. He claims that a disproportionate number of the death row inmates received the death sentence for killing caucasian victims and that most of the inmates are poor. Jeffers also alleges that there are no female inmates facing the death penalty in Arizona.

Jeffers seeks an evidentiary hearing to show this racial, sexual and economic discrimination. He claims that such a hearing is mandatory because the state court did not provide any hearing on this issue, *Harris v. Pulley*, 692 F.2d 1189, 1196–97 (9th Cir.1984) ["We do not believe that the State accorded Harris a full and fair hearing on these constitutional claims. Although we do not decide whether Harris has a right to

**1364**

a hearing in federal court under *Pierce,* we believe that the district court should, if it becomes necessary, provide an opportunity to develop the factual basis and arguments concerning race-discrimination and gender-discrimination claims."]. The Ninth Circuit's opinion in *Harris v. Pulley, supra,* imposes no requirement for this court to hold an evidentiary hearing based on the record in this case.

Under the heading of "Wealth and Age Discrimination" the court's discussion of the question of an evidentiary hearing warrants quotation in full:

> Harris also contends that the death penalty is being intentionally applied discriminatorily on the basis of the defendant's age and socio-economic status. Harris has made no showing of support for this claim. He argues that the state has the information necessary to present this claim, but has refused to disclose it.
>
> Harris' conclusory allegations do not provide a sufficient basis to obtain a hearing in federal court. We decline his invitation to hold that he has a right to an evidentiary hearing absent some stronger showing.

*Id.* at 1199.

For every matter that the Ninth Circuit remanded for an evidentiary hearing in that case, affidavits were submitted containing factual support. Prior to this case being transferred to the Tucson division, the Phoenix court conducted a telephonic conference on May 5, 1985. The parties were directed to supplement the record on this issue. Jeffers has submitted nothing further on this issue. The only support for this claim is as follows: "The State of Arizona keeps statistics on all persons convicted of murder in this State. That data, and only that data, can establish or refute the implication that the death row population of Arizona evinces discrimination on the basis of race and sex." *Reply Memorandum in Support of Motion for Evidentiary Hearing,* filed September 7, 1984 at page 13.

 Jeffers has been provided with the opportunity to provide facts to support his claims. He has decided to rely solely on the claims that the Respondents have the necessary information. This does not entitle him to a hearing on this claim. The request for an evidentiary hearing is denied.

 The court notes that even in the absence of an evidentiary hearing on this issue, there is no merit. As the Eleventh Circuit stated recently: "Proof of disparate impact alone is insufficient to invalidate a capital sentencing system, unless that disparate impact is so great that it compels a conclusion that the system is unprincipled, irrational, arbitrary and capricious such that purposeful discrimination—i.e. race is intentionally being used as a factor in sentencing-can be presumed to permeate the system." *McCleskey v. Kemp,* 753 F.2d 877, 892 (11th Cir.1985).

The record herein establishes the contrary. Race was not a factor in this death sentence. The record shows that the victim, Penny, was caucasian. Jeffers is also caucasian. Rather than supporting a claim of racial motivation in the application of the death sentence, this case indicates that race is not a factor.

There is no indication that the wealth of Jeffers was considered in the application of the death penalty. In fact, the record indicates that the trial court went out of its way to lessen the impact of Mr. Jeffers wealth. The court appointed a series of lawyers to represent Jeffers. He refused to even speak to several of these until he was able, over the objection of the prosecutor, to have the court appoint the particular attorney that Jeffers wanted. The gender based discrimination claim has no application to this case.

Jeffers has failed to allege any facts that would warrant a hearing on his claim of disproportionate impact on race, gender and wealth. An examination of the record indicates that race is not a factor here since both Jeffers and the victim are of the same race. In addition, Jeffers' wealth enabled him to get extra relief from the courts rather than injuring his case. An examina-

tion of the record in this matter indicates that rather than some other improper considerations, Jeffers is now under the sentence of death for the manner in which he murdered Penelope Cheney. The allegation presented here does not entitle Jeffers to any relief.

None of the allegations discussed above entitle Jeffers to relief under habeas corpus. Since this court has reviewed all of the allegations presented in the amended petition and has found them all to be without merit, Jeffers is not entitled to relief in this action. No certificate of probable cause will be granted by this court.

IT IS ORDERED that the motion for an evidentiary hearing is denied.

IT IS FURTHER ORDERED that the petition for a writ of habeas corpus in this action is denied.

IT IS FURTHER ORDERED that the stay of execution imposed by this court on December 4, 1983 is hereby vacated.

IT IS FURTHER ORDERED that this action is dismissed.

IT IS FURTHER ORDERED that no certificate of probable cause shall be issued in this matter.

## APPENDIX

The following records submitted to this court have been reviewed:

Transcripts:

| | |
|---|---|
| February 9, 1977 | preliminary hearing |
| February 10, 1977 | same |
| February 11, 1977 | same |
| March 14, 1977 | motion for writing exemplars |
| April 4, 1977 | motion to withdraw |
| April 28, 1977 | motion to continue |
| May 16, 1977 | motion to withdraw |
| May 23, 1977 (Incorrectly identified as May 23, 1978) | motion under Rule 11 |
| May 31, 1977 | motion for examination under Rule 11 |
| July 6, 1977 | motion to continue |
| July 25, 1977 | motion for appointment of investigator |
| July 29, 1977 | motion to continue |
| August 1, 1977 | motion for appointment of investigator |
| August 30, 1977 | motions to continue, appointment of counsel |
| September 6, 1977 | motion to withdraw |
| September 7, 1977 | motion to continue |
| September 9, 1977 | motion under Rule 11 |
| September 13, 1977 | motion to quash subpoena |
| September 14, 1977 | same |
| September 14, 1977 | same |
| September 19, 1977 | motion to depose witness |
| October 11, 1977 | motion to amend information |
| November 1, 1977 | motion under Rule 11 |
| November 7, 1977 | motion to continue |
| November 15, 1977 | hearing under Rule 11, motion to disclose witnesses, motion for change of venue |
| November 21, 1977 | motion to suppress evidence |
| November 23, 1977 | same |
| December 7, 1977 | motion to disclose evidence, motion to disclose witnesses |
| December 9, 1977 | motion to continue |
| December 12, 1977 | motion to continue |
| December 20, 1977 | pre-trial motions, motions in limine |
| December 27, 1977 | motion in limine |
| January 9, 1978 | motion to sequester jury, motion to disclose evidence |
| January 10, 1978 | trial-jury selection |
| January 11, 1978 | same |
| January 11, 1978 | voir dire of individual juror |
| January 12, 1978 | trial-jury selection |
| January 13, 1978 | same |
| January 17, 1978 | trial |
| January 18, 1978 | same |
| January 19, 1978 | same |
| January 20, 1978 | same |
| January 23, 1978 | same |
| January 24, 1978 | same |
| January 25, 1978 | same |
| January 26, 1978 | same |
| January 27, 1978 | same |
| January 31, 1978 | same |
| February 1, 1978 | same |
| February 2, 1978 | same |
| February 3, 1978 | same |
| February 6, 1978 | same |
| February 7, 1978 | same |
| February 8, 1978 | same |
| February 9, 1978 | verdicts |
| February 15, 1978 | motion for jury list |
| February 21, 1978 | motion to withdraw |
| March 6, 1978 | motion for new trial |
| April 14, 1978 | sentencing |
| July 3, 1978 | motion to set aside judgment |
| July 11, 1978 | same |
| February 26, 1979 | motion for summary dismissal of state rule 32 proceedings |
| April 9, 1979 | same |
| March 18, 1980 | motion to exclude judge |
| June 20, 1980 | evidentiary hearing on issues of re-sentencing |
| July 10, 1980 | re-sentencing |
| April 2, 1984 | motion for summary dismissal of state rule 32 proceedings |

Briefs
 Before the Arizona Supreme Court
 Appellants Opening Brief
 Appellees Answering Brief
 Appellants Reply Brief
 Appellants Opening Brief–Re-sentencing
 Appellees Answering Brief–Re-sentencing
 Motion for Re-hearing

 Before the United States Supreme Court
 Petition for a Writ of Certiorari